**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | : : : |
| Plaintiff, | : |
| v. | : |
| | : CIVIL ACTION NO. |
| BLUPRINT LLC, | : 9:22- 80092-CV-WM |
| | : |
| Defendant. | : |
| | : |

| | |
|---|---|
| MELANIE E. DAMIAN, AS RECEIVER of assets of Rajiv Patel, a/k/a Ravi Patel, a/k/a Raj Patel; MELANIE E. DAMIAN, AS RECEIVER OF RECEIVERSHIP ENTITY BLUPRINT, LLC; and MELANIE E. DAMIAN, RECEIVER, as Assignee of Claims of Kalpana Patel, | ANCILLARY CASE NO. 9:23-cv-80503-WM |
| Plaintiff, | |
| v. | |
| TD AMERITRADE, INC. and CHARLES SCHWAB FUTURES AND FOREX LLC f/k/a TD AMERITRADE FUTURES & FOREX, LLC, | |
| Defendants. | |

_____/

## AMENDED COMPLAINT

Melanie E. Damian, the court-appointed receiver ("Plaintiff" or the "Receiver") over the assets of Rajiv a/k/a Ravi Patel ("Mr. Patel") and over receivership defendant Bluprint, LLC ("Receivership Entity Bluprint") in the above-captioned enforcement action and as assignee of the claims of Kalpana Patel ("Ms. Patel"), files this Amended Complaint stating claims against Defendants TD Ameritrade, Inc. ("TDA") and Charles Schwab Futures and Forex LLC f/k/a TD Ameritrade Futures & Forex LLC ("Schwab").  Plaintiff, as Receiver and on behalf of Receivership

Entity Bluprint, asserts claims against TDA and Schwab for fraudulent transfer and unjust enrichment. Plaintiff, as assignee of Ms. Patel's claims, asserts claims against TDA and Schwab for aiding and abetting Mr. Patel's breach of fiduciary duty to Ms. Patel, negligence against Ms. Patel, and aiding and abetting Mr. Patel's violations of the Commodity Exchange Act which caused damages to Ms. Patel, and alleges as follows:

**PROCEDURAL HISTORY**

1.     On January 18, 2022, the Commodity Futures Trading Commission (the "CFTC") filed a Complaint for Injunctive Relief and Penalties Under the Commodity Exchange Act and Demand for Jury Trial [CFTC Action, ECF No. 1] against Mr. Patel and pre-receivership Bluprint LLC ("Bluprint"), commencing the above-captioned enforcement action (the "CFTC Action") pending in the U.S. District Court for the Southern District of Florida (the "Court").

2.     On January 18, 2022, the CFTC filed an Expedited Motion for an Ex Parte Statutory Restraining Order and Order to Show Cause [CFTC Action, ECF No. 4] and a Motion for Preliminary Injunction [*id.* at ECF No. 6]. On January 21, 2022, the Court entered a Corrected Order Granting Expedited Ex Parte Motion for Ex Parte Statutory Restraining Order and Granting Motion for Expedited Discovery [*id.* at ECF No. 14] (the "Statutory Restraining Order" or "SRO").

3.     On February 16, 2022, the CFTC filed a Renewed, Modified, and Unopposed Motion for Preliminary Injunction [*id.* at ECF No. 41] (together with the Motion for Preliminary Injunction, the "Motions for Preliminary Injunction").

4.     On February 17, 2022, the Court entered an Order Granting the Motions for Preliminary Injunction [*id.* at ECF No. 41] (the "Preliminary Injunction"). Pursuant to the Preliminary Injunction, the assets of Mr. Patel and Bluprint were frozen and all records of Mr. Patel and Bluprint's activities were ordered to be preserved. *See id.*

5.      On March 10, 2022, the CFTC filed a Motion for Appointment of a Receiver.  *Id.* at ECF No. 44.

6.      On March 30, 2022, the Court entered an Order Appointing Receiver, appointing Melanie E. Damian as receiver over the assets of Mr. Patel and over Bluprint.  *Id*. at ECF No. 50.

7.      The Receiver's mandate was to, *inter alia*, take exclusive custody, control, and possession of the assets of Mr. Patel and of Bluprint, assume full control of Bluprint, prevent the withdrawal or misapplication of funds entrusted to Mr. Patel and/or Bluprint, collect all money owed to Mr. Patel and/or Bluprint, perform all acts necessary to conserve, hold, manage, and preserve the value of the assets of Mr. Patel and/or Bluprint.  *See* Order Appointing Receiver [*id*. at ECF No. 50] at pp. 4-7.

8.      The Order Appointing Receiver created the receivership entity Bluprint LLC ("Receivership Entity Bluprint").

9.      Receivership Entity Bluprint is a creditor of Mr. Patel and of Bluprint.

10.     The Order Appointing the Receiver created the receivership estate comprised of all assets of Mr. Patel, all assets of Bluprint, all assets of Receivership Entity Bluprint, and any other assets traced to investor funds recovered by the Receiver (collectively, the "Receivership Estate").

11.     The Receiver, the Receivership Estate, and Receivership Entity Bluprint are each creditors of Mr. Patel and of Bluprint.

12.     The Order Appointing Receiver appointed the Plaintiff as Receiver over the assets of Mr. Patel, Bluprint, and Receivership Entity Bluprint, including all claims owned by Mr. Patel, Bluprint, and/or Receivership Entity Bluprint.

13.     Receivership Entity Bluprint settled the CFTC's claims against Bluprint by entering into a Consent Order for Equitable Relief Against Defendant Bluprint LLC (the "Bluprint Consent

Order"), entered by the Court on August 4, 2023, requiring Receivership Entity Bluprint to pay restitution totaling $8,863,753.77 plus post-judgment interest (the "Restitution Obligation") to Bluprint's investors and creditors.

14.     In the Bluprint Consent Order, the Court directed the Receiver to collect and distribute the Restitution Obligation.

15.     On August 4, 2023, the Court approved the Receiver's proposed Legal Notice of Claims Process, Claims Process, and Plan of Distribution, which the Receiver has implemented.  The Receiver has collected and reviewed claims against the Receivership Estate, which will be paid by Receivership Entity Bluprint, in accordance with this Court's Order Approving the Receiver's Claims Process and Plan of Distribution.

16.     Receivership Entity Bluprint has suffered actual damages in the amount of at least the $8,863,753.77 Restitution Obligation ordered by the Court based on the Bluprint trading scheme that is the subject of the CFTC Action.

17.     Ms. Patel was a named joint account holder with Mr. Patel on the accounts used to receive and trade investor deposits including the accounts held at TDA and Schwab.

18.     As a result of Ms. Patel's receipt of investor deposits in the joint accounts with Mr. Patel, the CFTC amended its Complaint to add Ms. Patel as a Relief Defendant to, among other things, enable the Receiver to seek recovery from Ms. Patel of any and all funds, assets, and other benefits traceable to Bluprint's investors, including Ms. Patel's interest in any accounts funded with and assets purchased using investor funds, among other relief.

19.     The CFTC's Amended Complaint sets forth the bases for the Receiver, the Receivership Estate, and Receivership Entity Bluprint's status as creditor of Ms. Patel.

20.     The Receiver, on behalf of the Receivership Estate and Receivership Entity Bluprint, asserted potential claims against Ms. Patel and members of the Patel family.  Thereafter, the Receiver and Ms. Patel settled those potential claims (the "Settlement").  The Settlement, among other things, provided for Ms. Patel's payment to the Estate of $4.3 million and the assignment of Ms. Patel's claims against TDA and Schwab to the Receivership Estate, authorizing the Receiver to bring those claims.

21.     The Settlement also provided for the entry of a bar order (the "Bar Order") barring the bringing of any future claims against Ms. Patel and members of her family by any potential creditor that received notice of the Settlement and Bar Order.

22.     TDA and Schwab received notice of the Settlement and Bar Order by service on their respective registered agents.  Such Order is now a final non-appealable order.

23.     Ms. Patel also settled the CFTC's claims against her as a Relief Defendant and entered into a Consent Order for Equitable Relief Against Relief Defendant Kalpana Patel [id. at ECF No. 122] (the "Patel Consent Order"), entered by the Court on August 4, 2023, requiring Ms. Patel to disgorge $2,334,467.25 in funds traced to investors.  Ms. Patel was given a dollar-for-dollar credit against her disgorgement obligation for her Settlement with the Receiver.

24.     Ms. Patel was not found liable for wrongdoing or of having knowledge of Mr. Patel and Bluprint's trading scheme.  She was named in the CFTC Action as a Relief Defendant solely based on her having possession of assets and funds traceable to Bluprint investor deposits.

25.     Pursuant to the Settlement, Ms. Patel turned over to the Receivership Estate ownership of $4.3 million in life insurance proceeds and other funds that she would have otherwise been entitled to retain.

26.     Ms. Patel suffered actual damages in the amount of at least $4.3 million plus legal fees and costs from the Settlement with the Receiver, being named as a Relief Defendant in the CFTC Action, and the Patel Consent Order resulting therefrom.

27.     The Order Appointing Receiver authorizes and directs the Receiver to initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings the Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate. *See id.* at ECF No. 50 at ¶ H.

## THE PARTIES

### The Receiver

28.     Plaintiff, Melanie E. Damian, was appointed by this Court as Receiver of the assets of Mr. Patel and over Bluprint and the Receivership Entity Bluprint.  Plaintiff brings this action in her capacity as Receiver over the assets of Mr. Patel, as Receiver of Bluprint, and/or as Receiver of Receivership Entity Bluprint pursuant to the authority granted by this Court in the CFTC Action.

29.     Pursuant to the assignment from Ms. Patel to Plaintiff of any claims and rights of action that Ms. Patel may have against TDA and Schwab, Plaintiff also brings this action in her capacity as assignee of Kalpana Patel.

### The Defendants

30.     Defendant TDA, at all material times was a Delaware limited liability company with its principal place of business in Omaha, Nebraska, but it conducts business and has customers all over the world including in the Southern District of Florida.

31.     TDA operates as a brokerage and trading institution which allows retail customers like Rajiv and Kalpana Patel (collectively, the "Patels") to trade using TDA's online trading platform.  TDA's platform brings execution and clearing services and allows for the online trade of

assets such as futures and stocks for retail customers such as the Patels. TDA is regulated under the Commodity Exchange Act, among other federal and state securities and commodities laws.

32.     Defendant Schwab at all material times was a Delaware limited liability company with its principal place of business in Chicago, Illinois, but it conducts business and has customers all over the world including in the Southern District of Florida.

33.      Prior to a name change in September 2021, as part of a buy-out, Charles Schwab Futures and Forex LLC was known as TD Ameritrade Futures & Forex LLC. Schwab and TDA are affiliated corporations pursuant to Schwab's purchase of TDA and TDA is under the umbrella of The Charles Schwab Corporation.

34.     Schwab operates as a futures commission merchant that solicits and accepts orders to buy or sell futures contracts for consumers such as the Patels. It is regulated under the Commodity Exchange Act, among other federal and state securities and commodities laws.

35.     The Patels had a joint TDA account with number ending in #4195 at TDA (the "TDA Brokerage Account #4195") from July 2002 until March 2021 (nearly 19 years). As a joint accountholder, Mr. Patel had fiduciary duties to Ms. Patel.

36.     When the Patels opened the TDA Brokerage Account #4195 in 2002, Ms. Patel signed the account opening documents with her legal signature.

37.     The Patels also had a joint futures and forex trading account with number ending in #F880 with TD Ameritrade Futures & Forex LLC from August 2019 until March 2021, which account was transferred under the umbrella of The Charles Schwab Corporation to Charles Schwab Futures and Forex LLC (the "Schwab Futures Account #F880").

38.     When Mr. Patel opened the Schwab Futures Account #F880, without Ms. Patel's knowledge, Ms. Patel did not sign the account opening documents. Ms. Patel's signature on the

Schwab Futures Account #F880 opening documents and disclosures does not match or even resemble her signature on the TDA Brokerage Account #4195 opening documents. Despite, Ms. Patel's signatures not matching, neither TDA nor Schwab attempted to verify Ms. Patel's consent to open the Schwab Futures Account #F880 in her name or to send funds from the TDA Brokerage Account #4195 in her name to the Schwab Futures Account #F880.

39.    From January 2019 through February 2021, Bluprint investor deposits were wired directly from investors into the TDA Brokerage Account #4195 and then immediately traded at TDA, or swept into the Schwab Futures Account #F880 for futures and forex trading at Schwab, or transferred by Mr. Patel to the Patels' accounts at other banks for personal use.

40.    Defendants TDA and Schwab jointly managed the Patels' accounts and their management was intertwined to the point that differentiating between the management activities and duties of Defendants is impractical if not impossible. This is evident through the numerous funds transfers occurring between the Patels' TDA Brokerage Account #4195 and Schwab Futures Account #F8880, all of which were documented in the Patels' brokerage account statements. Consequently, this Amended Complaint alleges the actions attributable to each Defendant to the extent possible and the actions so interwoven that the Defendant taking the action is interchangeable or only discernable based on the account that such action affects.

## JURISDICTION AND VENUE

41.    This action is brought to accomplish the ends sought and directed by the Court in the CFTC Action, which, among other things, appointed Plaintiff as the Receiver and authorized her to commence actions to recover assets of and for the benefit of the Receivership Estate and Receivership Entity Bluprint. This action is related to the claims in the CFTC Action, over which this Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, in that

this action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction, this Court has supplemental jurisdiction over the claims set forth herein pursuant to Title 28, United States Code, Section 1367(a). As such, this Court has subject matter jurisdiction over this action.

42. Plaintiff was appointed as Receiver in this District, the instant Complaint is brought to accomplish the objectives of the Preliminary Injunction and Order Appointing Receiver, and the property sought by Plaintiff is located in multiple districts.

43. This Court has personal jurisdiction over Defendant TDA and Defendant Schwab because each of those Defendants received funds from and/or traceable to Bluprint's investors located in the Southern District of Florida and from Mr. Patel, who was operating, conducting, engaging in, and carrying on a fraudulent business or business venture in, among other locations, the Southern District of Florida. Defendants each also received transfers comprised of commissions and fees from trading in the TDA Brokerage Account #4195 and Schwab Futures Account #F880 that were comprised of investor deposits and proceeds from Bluprint's fraudulent scheme conducted in the Southern District of Florida. Defendant TDA also directly received investor deposits from investors located in this District and those deposits were intended and marked for trading in the Bluprint investment scheme carried out in this District.

44. Defendant Schwab also received transfers representing commissions and fees incurred from trading in the Schwab Futures Account #F880 that were comprised of investor deposits and proceeds from Bluprint's fraudulent scheme conducted in the Southern District of Florida.

45.     The Court also has jurisdiction over each of the Defendants because they both regularly conduct business and recruit and serve customers in the State of Florida, including in this District.

46.     The Court also has personal jurisdiction over both Defendants because they received funds from the Patels, from Bluprint's investors, and/or belonging to Bluprint, while Mr. Patel and Bluprint were operating, conducting, engaging in, and carrying on a fraudulent business or business venture in, among other locations, this District.  The transfers that Defendants received from the Patels were of funds belonging to Bluprint derived from Bluprint's investors collected as a result of Bluprint's fraudulent scheme conducted, in part, in this District.

47.     Venue is proper in the Southern District of Florida pursuant to Title 28, United States Code, Sections 754 and 1692, because this action is brought to accomplish the objectives of the Preliminary Injunction and the Order Appointing Receiver and is thus ancillary to the Court's exclusive jurisdiction over the Receivership Estate.  Further, the transfers described in this Complaint were made from the Patels TDA and Schwab accounts using funds of Bluprint collected from Bluprint's investors located in the Southern District of Florida.  The parties have consented to a bench trial before the Magistrate Judge in this District.

**THE RECEIVER'S STANDING
TO BRING THE CLAIMS ASSERTED HEREIN**

48.     The Receiver has standing to bring the claims asserted in this Complaint pursuant to the Court's Order Appointing Receiver.  *See* CFTC Action, ECF No. 50 at ¶ H.  The Order Appointing Receiver authorizes and empowers the Receiver to:

> Initiate … or become a party to any actions or proceedings…that the Temporary Receiver deems necessary to preserve or increase the value of the Receivership Estate or that the Receiver deems necessary and advisable to carry out to Receiver's mandate under this Order.

*Id*. Included among such actions are fraudulent transfer actions to recover for the benefit of the Receivership Estate amounts that Mr. Patel and/or Bluprint fraudulently transferred to third parties.

49.     The Receiver, on behalf of Receivership Entity Bluprint and the Receivership Estate, is a "creditor" of pre-Receivership Bluprint and of Mr. Patel as defined in section 726.102, Florida Statutes.  As such, the Receiver has standing to bring the claims asserted in this Complaint under the Florida Uniform Fraudulent Transfer Act, section 726.101, Florida Statutes, *et seq*. and common law unjust enrichment (pled in the alternative to the fraudulent transfer claims).

50.     Moreover, the Receiver was assigned the rights of Kalpana Patel to pursue her claims against TDA and Schwab, and, as such, has standing to bring this action as assignee of Ms. Patel, as a former accountholder at both TDA and Schwab.

## FACTUAL ALLEGATIONS

51.     Defendants each knowingly and substantially assisted, aided and abetted, enabled, and facilitated Mr. Patel and Bluprint's fraudulent commodity pooling and Ponzi scheme that misused and misappropriated millions of dollars from sixteen Bluprint investors, all through the Patels' joint accounts held with each of the Defendants, leaving Mr. Patel and Bluprint subject to the CFTC Action and leaving Ms. Patel, the Receivership Estate, and Receivership Entity Bluprint liable to investors.

**Mr. Patel and Bluprint's Pooling Scheme**

52.     From at least June 2019 through January 2022 (the "Relevant Period"), Patel, through Bluprint, was involved in orchestrating a fraudulent scheme to solicit and misappropriate investor funds for the purported purpose of trading commodity futures and securities in a commodity pool. Bluprint solicited at least $11.8 million from at least sixteen investors and misappropriated the funds by depositing monies into trading accounts, including the TDA Brokerage Account #4195 at TDA and the Schwab Futures Account #F880 at Schwab.

53.     Bluprint is a Florida limited liability company formed in June 2018 that operated from the Patels' residence in Wellington, Florida.  Mr. Patel was the managing director and Chief Executive Officer of Bluprint.

54.     Mr. Patel advertised Bluprint as a company providing expertise in commodity futures trading and touted his extensive expertise and skill in identifying profitable trades on behalf of himself and Bluprint's investors, with guaranteed returns for investors.  Mr. Patel held discretionary authority on how to invest Bluprint's investors' money.  Investors were not involved in or informed of the daily trading activity, profits or losses, or otherwise.

55.     Mr. Patel always represented himself as extremely wealthy and successful and advised Bluprint's investors that he was essentially doing them a favor in allowing them to pool their funds in the TDA Brokerage Account #4195 so that he could manage their funds as he did his personal funds and create similar wealth for Bluprint's investors.

56.     The TDA Brokerage Account #4195 used by Patel for the Bluprint investment scheme was opened by the Patels nearly 20 years ago for personal investing.  Thus, both Rajiv and Kalpana Patel were account holders named on the TDA Brokerage Account #4195.

57.     Prior to the creation of the Bluprint investment scheme, the TDA Brokerage Account #4195 had not been used to collect large deposits from third parties or to carry out high volume or margin trading at the high levels of risk implemented during the Bluprint investment scheme.

58.     During the Relevant Period, Mr. Patel solicited the Bluprint investors for the purpose of offering trading services.  Mr. Patel and Bluprint acted as a commodity pool operator ("CPO") by soliciting and receiving the funds from investors, which were, in large part, deposited into the TDA Brokerage Account #4195.

59.     Almost immediately upon receipt of investor deposits into the TDA Brokerage Account #4195, Bluprint misappropriated investors' deposits by using the funds for the Patels' personal expenses and/or high-risk trading seamlessly transferring the funds from the TDA Brokerage Account #4195 to the Schwab Futures Account #F880.

60.     Indeed, the TDA Brokerage Account #4195 was used to collect over $6.3 million in investor deposits and then automatically transferred those funds to the Schwab Futures Account #F880 to fill trading orders entered by Mr. Patel on behalf of Bluprint and to cover margin calls incurred due to trading losses.  Thus, the two accounts operated like one account with a constant flow of investor funds marked for investment in Bluprint into the TDA Brokerage Account #4195 and an automated flow of those investor funds out of the TDA Brokerage Account #4195 at TDA and into the related Schwab Futures Account #F880 at Schwab.

61.     Investor funds deposited into the TDA Brokerage Account #4195 were also transferred to other bank accounts and spent on personal expenses and on making payments to other investors (akin to a Ponzi scheme).

62.     As a result of this fraudulent behavior, the CFTC commenced the CFTC Action against Mr. Patel and Bluprint that resulted in entry of the Preliminary Injunction finding that Bluprint engaged in fraud in connection with commodity futures and options transactions by making misrepresentations of material fact to pool participants.  By the time the fraud was uncovered, the funds were largely or completely depleted.

63.     Indeed, the Bluprint fraud was perpetrated through and facilitated by the accounts held at TDA and Schwab for nearly two years.  Specifically, Mr. Patel and Bluprint directly and indirectly received and pooled investor deposits in the TDA Brokerage Account #4195.  *See* CFTC Action, ECF No. 41, at p. 11.  Then, they used the TDA Brokerage Account #4195 and the Schwab

Futures Account #F880 to trade those pooled funds.  During the Relevant Period, Mr. Patel opened the Schwab Futures Account #F880 at Schwab to carry out even more high-risk, margin trades of pooled Bluprint investor funds.

64.     When certain investors demanded a return of their investments, Bluprint made those payments by using funds it received from new or repeat investors who continued to invest with Bluprint, making the business a classic Ponzi scheme.

65.     According to the Patels' banking and trading account statements, the Bluprint trading activity carried out through Defendants' trading platforms was never profitable and indeed only incurred significant losses for the Patels, Bluprint, and its investors.  And, Mr. Patel and Bluprint only generated "revenue" in the form of investments from investors totaling approximately $11.8 million, most of which was lost in trading through each of Defendants' platforms and in commissions and fees paid to Defendants.

66.     Mr. Patel's bank records show that Mr. Patel also obtained a loan and deposited the loan proceeds into the same TDA Brokerage Account #4195 into which the investor funds were deposited, such that they were commingled with the funds from investors and short-term trading profits in the TDA Brokerage Account #4195.  The deposit of loan proceeds directly into the TDA Brokerage Account #4195 came from a third-party lender.

67.     Because Mr. Patel's trading activity was not generating sufficient revenues for Bluprint to pay the amounts guaranteed to the investors, Bluprint covered the significant shortfall primarily by using funds it obtained from new and repeat investors, and also by using the commingled proceeds of a significant loan it received from a lender, to return funds to earlier investors to perpetuate and conceal the scheme, to continue high-risk trading, and to make payments towards the loan.

68.     A substantial portion of the financial misconduct was perpetrated through and facilitated by accounts held with both Defendants, which were used to further Bluprint's commodity pooling and Ponzi scheme.  The Ponzi scheme started no later than June 2019, when the revenues or returns from Mr. Patel's trading activity at TDA and Schwab was considerably lower than, and insufficient to pay, the amounts that Mr. Patel had promised the investors would make on their investments.  And, the balances in the TDA and Schwab accounts were significantly less than the total amount the investors had invested with Mr. Patel and Bluprint.

69.     One investor received the return of its full investment plus additional amounts, and other investors received partial returns of their investments because they were early investors who demanded repayment well before the commencement of the CFTC Action or because Mr. Patel chose to pay them to prevent them from speaking poorly of the Bluprint investment scheme to potential investors.

70.     But, the majority of investors received back significantly less than the amounts they had invested or nothing at all because they invested closer in time to the commencement of the CFTC Action.

**Preliminary Findings of Fraud Against Mr. Patel and Bluprint**

71.     As a result of this fraudulent behavior, the CFTC commenced the CFTC Action against Mr. Patel and Bluprint that resulted in entry of the Preliminary Injunction containing preliminary findings that Mr. Patel and Bluprint likely participated in a fraudulent commodity trading scheme.

72.     At all times material hereto, Mr. Patel controlled and operated Bluprint as a means to carry out the fraudulent scheme, thereby causing Bluprint to commit violations of commodity futures trading laws and rules, common law fraud, and breaching his fiduciary duties to Bluprint, its

investors and to Ms. Patel through the use of their joint accounts to carry out the scheme. Bluprint was under the control of Mr. Patel until his death in January 2022 after the commencement of the CFTC Action and thus unable to cease the fraudulent activity and/or seek recovery of the misappropriated funds or fraudulent transfers prior to that point or the appointment of the Receiver in March 2022. Ms. Patel was unaware of the fraudulent scheme until the commencement of the CFTC Action and therefore unable to cease the fraudulent activity and/or seek recovery of the misappropriated funds or fraudulent transfers prior to that point.

73.     In the Preliminary Injunction, the Court determined that the record supported a finding that between at least "June 2019 and continuing through the date of service of the Statutory Restraining Order, January 21, 2022 ("the Relevant Period"), at least sixteen third-party individuals and entities provided Patel and Bluprint a total of at least $11,830,000 for the purpose of investing in Bluprint and sharing in profits earned from Bluprint's investment ventures, which purportedly included trading commodity futures, among other things." *Id.* at p. 5.

74.     With respect to those third-party funds, the Court held that the record supported the CFTC's prima facie showing that during the Relevant Period,

> Patel and Bluprint engaged in fraud in connection with commodity futures and options transactions by making misrepresentations of material fact to pool participants, misappropriating pool participant funds, and issuing false account statements; engaged in fraud and deceit as a commodity pool operator (CPO) and associated person (AP) of a CPO; failed to register Bluprint as a CPO and filed to register as an AP of a CPO; commingled commodity pool funds; failed to operate a commodity pool as a separate entity; received pool participants' funds in a name other than that of the commodity pool; and failed to provide certain pool disclosure documents and other documents required to be provided to pool participants under Commission Regulations. Therefore, there is good cause to believe that Defendants, by and through their agents, principals, and control persons, have engaged in, are engaging in, or are about to engage in violations of Sections 4b(a)(1)(A)-(C), 4c(b), 4k(2), 4m(1), and 4o(1)(A)-(B) of the [Commodity Exchange] Act [(the "Act")], 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6c(b), 6k(2), 6m(1), 6o(1)(A)-(B), and Regulations 4.20(a)(1), (b), and (c), 4.21, 4.22, and 32.4, 17 C.F.R. §§ 4.20(a)(1), (b), and (c), 4.21, 4.22, 32.4 (2021).

Preliminary Injunction [CFTC Action, ECF No. 41, at pp. 14-15; *see also* Order Granting Expedited Ex Parte Motion for Ex Parte Statutory Restraining Order and Granting Motion for Expedited Discovery [ECF No. 11 at p. 3]; Corrected Order Granting Expedited Ex Parte Motion for Ex Parte Statutory Restraining Order and Granting Motion for Expedited Discovery [ECF No. 14 at p. 3].

Further, the Court ordered a continued freeze of Mr. Patel's and Bluprint's liquid and illiquid assets, including funds held in bank and trading accounts in either of their names. *See* Preliminary Injunction at p. 15.  Finally, the Court held that the CFTC's requested relief of disgorgement and restitution for pool participants was appropriate in this case. *See id.*

**The Insolvency of Mr. Patel and Bluprint**

75.     As a result of operating a commodity pooling and Ponzi scheme, Mr. Patel and Bluprint were insolvent, undercapitalized, and operating at a loss.  During all relevant times, Mr. Patel and Bluprint did not have sufficient assets to pay its debts to investors and/or creditors as those debts became due.

76.     Mr. Patel and Bluprint's trading activity resulted in significant overall trading losses of the investors' funds totaling at least $5,117,353.75.  Mr. Patel and Bluprint distributed $2,964,841.23 to investors (in Ponzi scheme fashion).  Mr. Patel allowed Defendants to take at least $414,086.96 in commissions and fees out of the TDA Brokerage Account #4195 and Schwab Futures Account #F880.  Mr. Patel used the remainder of the funds totaling at least $2,865,631.71 to pay for his personal living expenses and luxury items and experiences. Consequently, by November 21, 2021, Mr. Patel and Bluprint had depleted nearly all of the investors' funds.

77.    Because most investors have not received the return of their investment or all of the amounts due to them, these investors have significant claims against the Receivership Estate, Receivership Entity Bluprint, and/or Ms. Patel to recover their investments.

**The Fraudulent Transfers from Bluprint to TDA and Schwab**

78.    From February 2019 to March 2021, Defendant TDA received at least $97,022.72 in commissions and fees from the TDA Brokerage Account #4195, and from September 2019 to March 2021, Defendant Schwab received at least $317,064.24 in commissions and fees from the Schwab Futures Account #F880.  Thus, Defendants TDA and Schwab together paid themselves significant commissions and fees totaling approximately $414,086.96 (collectively, the "Transfers") from the voluminous trading occurring in the TDA Brokerage Account #4195 and Schwab Futures Account #F880.  Those Transfers came directly from Bluprint investors' deposits into the TDA Brokerage Account #4195 and swept into the Schwab Futures Account #F880.

79.    The investors earmarked their deposits into the TDA Brokerage Account #4195 as investments in Bluprint.  The investors also entered into profit sharing agreements with Bluprint to govern their investments in Bluprint.  Thus, all deposits by investors into the TDA Brokerage Account #4195 were funds of Bluprint.  The TDA Brokerage Account #4195 and the Schwab Futures Account #F880 were both funded with investor deposits.  When Defendants took the Transfers from the TDA Brokerage Account #4195 and Schwab Futures Account #F880, Defendants were taking the funds of Bluprint deposited by Bluprint's investors.

80.    The TDA Brokerage Account #4195 and the Schwab Futures Account #F880 suffered significant losses and never made any realized gains.  Bluprint's investors lost at least $6.3 million through the trading activity in the TDA Brokerage Account #4195 and in the Schwab Futures Account #F880.  Ms. Patel suffered liability for the losses that occurred in the Patels' joint accounts.

Not only did Ms. Patel suffer liability to the Receivership Estate, Receivership Entity Bluprint, and Bluprint's investors, but also, Ms. Patel lost all of her life savings in the Bluprint scheme carried out through the Patels' accounts held with Defendants.

81.     Therefore, Defendants did not provide any value to Bluprint or its creditors or to the Patels in exchange for the Transfers of fees and commissions that they received.

82.     The Receiver, on behalf of Receivership Entity Bluprint and the Receivership Estate, is a "creditor" of Bluprint and of Mr. Patel as defined in section 726.102, Florida Statutes.  As such, the Receiver has standing to bring the claims asserted in this Complaint under the Florida Uniform Fraudulent Transfer Act, section 726.101, Florida Statutes, *et seq*. and common law unjust enrichment (pled in the alternative to the fraudulent transfer claims).

**Defendants' Involvement in Patel and Bluprint's Scheme**

**Patel and Bluprint Carry Out Pooling and Ponzi Scheme in Patels' Joint Accounts**

83.     Mr. Patel breached his fiduciary duties to Ms. Patel by: (1) knowingly and intentionally operating Bluprint as a commodity pooling scheme and as a Ponzi scheme through the use of their joint accounts at TDA and Schwab; and (2) diverting investor funds deposited in the Patels' joint accounts for high-risk trading and for his personal benefit, in breach of his fiduciary duty to Ms. Patel.  TDA and Schwab facilitated both aspects of Mr. Patel's ongoing fraudulent scheme and breaches of fiduciary duties to Ms. Patel thereby aiding and abetting Mr. Patel's breaches and breaching their own fiduciary duties and duty of care to joint accountholder, Ms. Patel.

84.     TDA and Schwab each had knowledge of Patel's Bluprint trading scheme derived from: (i) processing and accepting the third-party deposits of funds into the TDA Brokerage Account #4195 maintained at Defendant TDA via wire transfers that were specifically labeled for investment in Bluprint; (ii) opening of the Schwab Futures Account #F880 at Schwab where Mr. Patel listed

Bluprint as his employer without verifying the Patels' sources of income and/or Ms. Patel's forged signature, knowledge of the account or consent to the nature of the high-risk trading to be carried out therein; (iii) processing and accepting Mr. Patel's immediate transfer of third-party funds deposited in the Brokerage Account to TDA's and Schwab's high-risk trading platforms and misuse of those funds in the Schwab Futures Account #F880 at Schwab and on TDA's margin trading platforms; (iii) witnessing how Mr. Patel's account management and investing style, commencing in June 2019, greatly differed from the Patels' investment style for the previous 17 years; (iv) witnessing that Mr. Patel's account management and investment style commencing in June 2019 was not sustainable; (v) processing and transferring at Mr. Patel's direction funds to third parties using new third-party deposits labeled for investment in Bluprint and commingling third-party deposits with the Mr. Patels' personal funds and loan proceeds; (vi) preparation of account statements and demands for payment of margin debt evidencing that Mr. Patel's high-risk trading generated little or no revenue; (vii) discharging of anti-money-laundering (AML)-related duties pertaining to "know your customer" and customer due diligence, both at onboarding and throughout the brokerage relationship with the Patels; and (viii) access to personal and financial information for the Patels, including without limitation Ms. Patel's legal signature, which revealed that Mr. Patel was misusing the TDA Brokerage Account #4195 and Schwab Futures Account #F880, without Ms. Patel's knowledge, consent, or participation.

85.     With TDA and Schwab's assistance, Mr. Patel was able to pool investor funds and to use new investor funds to carry out high-risk trading and to pay amounts owed to Bluprint's earlier investors thereby operating a Ponzi scheme through the Patels' joint accounts held with Defendants.

86.     Generally, both TDA and Schwab facilitated the operation of a commodity pooling scheme and of a Ponzi scheme in the Patels' joint accounts, pursuant to Mr. Patel's instructions and

transfer orders, which were carried out seemingly without question.  Specifically, (i) Defendant TDA reviewed and processed high-dollar amount, electronic transfers from third parties coming into the Patels' TDA Brokerage Account #4195 earmarked as investments in Bluprint in the memo line of the wire transfer; (ii) Defendant TDA, on Mr. Patel's instructions, swept those investor funds from the TDA Brokerage Account #4195 to the Schwab Futures Account #F880 for high-risk, margin trading; (iii) Defendant Schwab carried out Mr. Patel's constant orders in a frenzied, day-trading style incurring significant losses and prompting automatic margin calls paid for by debiting the TDA Brokerage Account #4195; (iv) Defendants TDA and Schwab together swept those funds out of the TDA Brokerage Account #4195 for payment of margin debts; (iv) Defendant TDA also transferred investor funds earmarked for investment in Bluprint out of the TDA Brokerage Account #4195 as payments to earlier investors; (v) Defendant TDA also transferred investor funds earmarked for investment in Bluprint out of the TDA Brokerage Account #4195 to various other futures trading merchants; (vi) Defendant TDA also transferred investor funds earmarked for investment in Bluprint out of the TDA Brokerage Account #4195 to Mr. Patel for personal expenses; (vii) Defendants TDA and Schwab both sat by and consciously and recklessly ignored and/or actively assisted in the rapid depletion of over $6 million in investor funds earmarked for investment in Bluprint; and (viii) despite the significant losses in the Patels' accounts, both Defendants together collected over $414,086.96 in commissions and fees.

87.    TDA allowed Mr. Patel to pool third party funds earmarked for investment in Bluprint in the TDA Brokerage Account #4195 and then to trade them improperly in a commodity trading pool and to transfer away those funds to TDA and Schwab's high-risk trading platforms, for improper purposes, in breach of applicable commodity futures trading laws and in breach of Mr. Patel and Bluprint's fiduciary duties to Ms. Patel and in breach of Defendants' fiduciary duties and

duty of care to Ms. Patel as an innocent, unknowing joint accountholder at TDA and at Schwab.

88.     Mr. Patel carried out this obvious pooling and Ponzi scheme for two years, until March 2021, when TDA closed all of the Patel family's accounts at both TDA and Schwab because they could no longer ignore the pooling of third-party funds and high-risk trading scheme, but not before depleting both the TDA Brokerage Account #4195 and the Schwab Futures Account #F880 to $0.

89.     Neither TDA nor Schwab alerted any banking or trading authorities to the Bluprint pooling scheme or otherwise reported any suspicious activity that occurred in the Patels' accounts. Instead, they quietly and with a one-paragraph letter sent by TDA closed all of the Patels' accounts.

90.     As a result of the foregoing failure to notify any regulator or Ms. Patel, Mr. Patel, in March 2021, began trading Bluprint investor funds with various other trading institutions through which he continued to operate Bluprint as a Ponzi scheme without pause for 10 additional months, thereby increasing the liability faced by Ms. Patel.

**<u>Overview of Banking Regulations Applicable to Defendant</u>**

91.     Both TDA and Schwab are subject to a myriad of banking regulations designed to prevent them from disregarding or assisting in fraudulent and illegal behavior by their customers. Compliance with those regulations required Defendants to learn about the Patels' businesses and backgrounds and account-related activities.

92.     Regulations require that banks implement procedures that enable them to accurately identify their customers and collect relevant information to "form a reasonable belief that it knows the true identity of each customer".  31 C.F.R. §§ 1020.220(a)(1), (2).  Accordingly, banks are required to obtain information about the account holder for every account at the onboarding stage and throughout the banking relationship.

93.     Defendants TDA and Schwab are bound by the Bank Secrecy Act (BSA), which mandates that the bank must create, manage, and uphold a program to ensure adherence to additional anti-money laundering measures.  *See* 12 C.F.R. § 21.21.  The BSA also applies to Defendant Schwab as a futures commission merchant.  It requires financial institutions to implement various measures to prevent money laundering, terrorist financing, and other illegal financial activities. Specifically, Defendants must: (1) institute a system of internal controls to guarantee ongoing BSA compliance; (2) undertake independent testing of the bank's compliance; (3) appoint an individual to oversee and monitor compliance; and (4) provide relevant personnel with appropriate training. Financial institutions must also file reports with the Financial Crimes Enforcement Network (FinCEN) for certain types of transactions, such as large deposits and suspicious activity.

94.     Defendants also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct.  This enables the bank to identify unusual or suspicious transactions for each customer. The customer due diligence program provides the bank with the ability to monitor the financial activity of its customers and predict the type and frequency of transactions in which they are likely to engage.

95.     Customer due diligence ("CDD") programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid.  Where a customer is determined to be high risk (such as the Patels based on the high-volume trading), banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

96.     The customer due diligence is required at the onboarding stage and continuously

throughout the banking relationship.

97.     The Code of Federal Regulations outlines additional responsibilities of futures commission merchants to know your customer and prevent possible money schemes.  *See* 31 CFR §§1026.210, 1026.220.  It outlines that Defendant Schwab should: (1) conduct ongoing monitoring to identify and report suspicious activity; (2) implement a Customer Identification Program ("CIP") to enable TDA to know the true identity of the customer; and (3) understand the nature and purpose of the customer relationship for the purpose of developing a customer risk profile.  *Id.*

98.     Defendants and their personnel must be able to identify and take appropriate action once put on notice of any of a series of suspicious or improper behaviors set forth in the Federal Financial Institutions Examination Council's ("FFIEC") Bank Secrecy Anti-Money Laundering Manual ("FFIEC Manual"), including: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company.  *See* FFIEC BSA/AML Examination Manual, https://bsaaml.ffiec.gov/manual.

99.     Having in their possession the financial information about the Patels and all of Mr. Patel's banking transactions, acquired in part through Defendants' discharge of their BSA/AML-

related duties, Defendants had actual knowledge of Bluprint's Ponzi scheme. Defendants facilitated and substantially assisted the scheme in violation of their obligations under federal laws and regulations. Indeed, after having full knowledge of the change of the TDA Brokerage Account #4195 from a personal brokerage account to a high-volume, high-risk trading account funded by third-party deposits earmarked for investment in Bluprint, TDA and Schwab continued to do business with Mr. Patel allowing Mr. Patel to accept new investments from new unsuspecting victims thereby breaching their fiduciary duties and duties of care to Ms. Patel and increasing the liability of Ms. Patel as a joint accountholder.

100.    Pursuant to their compliance with the banking regulations and requirements, Defendants had sufficient evidence and other indicia of wrongdoing to know about Mr. Patel and Bluprint's scheme yet looked the other way from the fraud being perpetuated in plain sight within and through the TDA Brokerage Account #4195 and the Schwab Futures Account #F880, thereby breaching their fiduciary duties and duties of care to Ms. Patel and increasing the liability of Ms. Patel as a joint accountholder.

**Use of the Patels' Joint TDA Brokerage Account #4195 to Receive Investor Deposits**

101.    On February 11, 2019, the TDA Brokerage Account #4195 received a wire for $750,000[1] from Bluprint investor A.[2]

102.    On June 5, 2019, the TDA Brokerage Account #4195 received a wire for $300,000 from Bluprint investors B and C with the memo line of the transfer stating "for benefit of Rajiv Patel/Blueprint a/c#774244195."

---

[1] Many of the listed incoming wire transactions indicated on their face that the money was being deposited in the Patels' accounts were from investors and earmarked for investment in Bluprint.

[2] The names of the investors will be represented by letters to protect their identities and prevent their further victimization.

103.     On July 3, 2019, the TDA Brokerage Account #4195 received a wire for $298,000 from TEM, LLC.  These funds represented loan proceeds used to fund the Bluprint trading scheme.

104.     On August 12, 2019, the TDA Brokerage Account #4195 received a wire for $100,000 from Bluprint investor A with the memo line of the transfer stating "774244195 Rajiv Patel/Blueprint" and a wire for $100,000 from Bluprint investors B and C with the memo line of the transfer stating "FBO: A/C 774244195 Rajiv Patel/Bluprint."

105.     On October 8, 2019, the TDA Brokerage Account #4195 received a wire for $100,000 from Bluprint investor D with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

106.     On November 29, 2019, the TDA Brokerage Account #4195 received a wire for $100,000 from Bluprint investor E with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

107.     On December 17, 2019, the TDA Brokerage Account #4195 received a wire for $50,000 from Bluprint investor E with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

108.     On January 16, 2020, the TDA Brokerage Account #4195 received a wire for $1 million from Bluprint investor F with the memo line of the transfer stating "FBO 774244195 Blueprint Rajiv Patel."  Defendant TDA advised Mr. Patel by email that it was reviewing this third-party deposit and that all such third-party deposits are subject to review and return.  TDA informed Mr. Patel that if the wire was accepted, it would be an exception to TDA's inbound wire procedures which do not allow TDA to accept wires from third parties into accounts such as the TDA Brokerage Account #4195.  TDA advised Mr. Patel that in the future it would not accept wires from third parties into the TDA Brokerage Account #4195.  But, TDA violated its own procedures and continued to

accept large wires from third parties into the TDA Brokerage Account #419.  TDA did not return the $1 million wire to the Bluprint investor that had sent it.  Nevertheless, TDA admittedly carefully reviewed all such third-party wires and saw the memo lines referencing Bluprint.  TDA then chose to make at least 23 exceptions to its inbound wire procedures and accepted at least that many third-party wires into the TDA Brokerage Account #4195.  In fact, TDA did not return any of the 23 third-party wires that the Patels' received in their TDA Brokerage Account #4195.  TDA did not notify Ms. Patel of the receipt of this or any of the other significant third-party wires into the TDA Brokerage Account #4195.  TDA did not notify Ms. Patel of its repeated violations of its own policies and procedures to accept third-party wires into the TDA Brokerage Account #4195.

109.   On January 21, 2020, the TDA Brokerage Account #4195 received a wire for $500,000 from Bluprint investor G with the memo line of the transfer stating "For further credit to acct 774244195 Rajiv Patel/Blueprint."

110.   On February 26, 2020, the TDA Brokerage Account #4195 received a wire for $75,000 from Bluprint investor H with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

111.   On March 20, 2020, the TDA Brokerage Account #4195 received a wire for $500,000 from Bluprint investors B and C with the memo line of the transfer stating "FBO account 774244195 Rajiv Patel/Bluprint."

112.   On April 21, 2020, the TDA Brokerage Account #4195 received a wire for $75,000 from Bluprint investor H and a wire for $75,000 from Bluprint investor E with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

113.    On April 30, 2020, the TDA Brokerage Account #4195 received a wire for $75,000 from Bluprint investor E with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

114.    On May 22, 2020, the TDA Brokerage Account #4195 received a wire for $1,500,000 from Bluprint investors B and C with the memo line of the transfer stating "FBO Account 774244195 Rajiv Patel/Bluprint purpose investment."

115.    On June 17, 2020, the Brokerage Account #4195 received a wire for $50,000 from Bluprint investor E with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

116.    On August 28, 2020, the TDA Brokerage Account #4195 received a wire for $25,000 from Bluprint investor E with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

117.    On September 9, 2020, the TDA Brokerage Account #4195 received a wire for $500,000 from Bluprint investor I with the memo line of the transfer stating "for benefit acct 774244195 Rajiv Patel-Bluprint."

118.    On September 25, 2020, the TDA Brokerage Account #4195 received a wire for $70,000 from Bluprint investor E with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

119.    On October 20, 2020, the TDA Brokerage Account #4195 received a wire for $100,000 from Bluprint investor E with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

120.    On October 21, 2020, the TDA Brokerage Account #4195 received a wire for $300,000 from Bluprint investor J with the memo line of the transfer stating "investment for benefit of account #774244195 Rajiv patel/Bluprint."

121.    On January 27, 2021, the TDA Brokerage Account #4195 received a wire for $15,000 from Bluprint investor H and a wire for $25,000 from Bluprint investor E with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

122.    On February 1, 2021, the TDA Brokerage Account #4195 received a wire for $200,000 from Bluprint investors K and L with the memo line of the transfer stating "For benefit of account #774244195 Rajiv Patel/Bluprint."

123.    On February 2, 2021, the TDA Brokerage Account #4195 received a wire for $75,000 from Bluprint investors M and N.

124.    Defendant TDA received 22 wires totaling over $6 million specifically earmarked for investment in Bluprint.  Thus, TDA had actual knowledge of the use of the TDA Brokerage Account #4195 and Schwab Futures Account #F880 for Bluprint's an investment pooling scheme.

125.    TDA then constantly swept Bluprint's investor deposits from the TDA Brokerage Account #4195 into trading platforms at TDA and in the Schwab Futures Account #F880 to carry out Mr. Patel's orders and to meet margin calls due to excessive trading losses.

126.    Rather than stop Mr. Patel or decline to help him misuse Bluprint investor money, both Defendants executed his instructions to misappropriate investor money thereby increasing the liability to investors of Bluprint and Ms. Patel as a joint accountholder.

**Use of the Brokerage and Futures Account to Trade Investor Funds**

127.    Throughout the Relevant Period, without Ms. Patel's knowledge, Mr. Patel used the TDA Brokerage Account #4195 to sweep Bluprint investor deposits into trading platforms at TDA

and Schwab.  Those platforms allowed for trading on margin thereby allowing for significant losses which Mr. Patel then covered with new investor funds deposited directly into the TDA Brokerage Account #4195 without Ms. Patel's knowledge.

128.    TDA not only failed to do anything to stop Mr. Patel from using the Patels' accounts, which TDA knew held third-party funds earmarked for investment in Bluprint, not the Patels' personal money; it also actively and knowingly assisted him, in a substantial departure from typical banking practices, by allowing him to open the Schwab Futures Account #F880 without any due diligence and without Ms. Patel's knowledge or consent.

129.    In addition to the brokerage and futures trading occurring through the TDA Brokerage Account #4195, on August 16, 2019, Mr. Patel opened the Schwab Futures Account #F880 with TD Ameritrade Futures and Forex, LLC (which was later transferred to Schwab).  Mr. Patel completed an online new account approval form, which he signed and submitted on behalf of himself and on behalf of Ms. Patel, without the knowledge or consent of Ms. Patel.  This caused the opening of the Schwab Futures Account #F880 by Rajiv and Kalpana Patel as joint tenants, even though the account opening was not authorized by Ms. Patel.  Indeed, Ms. Patel never saw the account opening form, never signed it, and never authorized the opening of the Schwab Futures Account #F880 in any way.

130.    At the time of opening the Schwab Futures Account #F880, Mr. Patel provided TDA and Schwab with a copy of Ms. Patel's driver's license which displays her legal signature. Mr. Patel also submitted the Schwab Futures Account #F880 opening documents with Ms. Patel's signature signed by him.  The two versions of Ms. Patel's signature do not resemble each other. Neither TDA nor Schwab questioned the discrepancy in Ms. Patel's signature.  Moreover, Mr. Patel only provided his email address for communications from TDA and Schwab and neither Defendant ever requested

an email address for Ms. Patel or tried to contact her through electronic or other means.  Instead, Defendants authorized the opening of the Schwab Futures Account #F880 at Schwab without Ms. Patel's knowledge or consent, without providing her any account opening documents or disclosures, and without securing a way to communicate with her in the future to provide her with account statements and other information.  As a result, Ms. Patel remained completely without knowledge concerning the opening of the Schwab Futures Account #F880 and the trading activity carried out therein.

131.    Despite the fact that the Schwab Futures Account #F880 opened in the name of Ms. Patel was for high-risk trading and Ms. Patel did not have any trading experience or licenses, TDA did not investigate her name appearing on that account.  Indeed, TDA did not take any steps to verify her authorization of the account opening.  TDA did not take any steps to investigate whether Ms. Patel was qualified to own and use the Schwab Futures Account #F880.

132.    The Patels' account opening application that Ms. Patel actually signed in 2002 and provided to TDA at the time of opening the TDA Brokerage Account #4195 lists Ms. Patel as a homemaker.  The updated account information provided by Mr. Patel to TDA on July 1, 2020, states that Ms. Patel is a homemaker and does not state any annual income for her.  Ms. Patel has never represented to TDA or Schwab that she was an investor or otherwise qualified to engage in trading activities.

133.    Indeed, Ms. Patel is not a sophisticated investor.  In fact, she does not have any securities or commodity futures trading experience.  Ms. Patel was completely unaware of the trading of investor funds in any of the joint accounts held by the Patels with Defendants. Specifically, Ms. Patel was completely unaware of the depositing, pooling, and/or trading of investor funds in the

TDA Brokerage Account #4195.  Ms. Patel was completely unaware of the existence of the Schwab Futures Account #F880 in her name until her deposition in the CFTC Action.

134.    Defendant TDA did not make any attempt to provide Ms. Patel with trading statements for the TDA Brokerage Account #4195.  TDA emailed all statements and other notices only to Mr. Patel.  Defendant TDA allowed Mr. Patel to completely control the TDA Brokerage Account #4195 receiving all statements and other notices without providing any notice by email, regular mail, or telephone to Ms. Patel.  Despite the significant losses and constant margin calls, Defendant TDA never notified Ms. Patel of the activity in the TDA Brokerage Account #4195.

135.    In October 2020, when Mr. Patel was suffering significant losses in the Schwab Futures Account #F880, he asked Schwab to increase his margin risk tolerance.  Schwab devised a method to do so by applying the Futures Intraday Margin requirements to the Schwab Futures Account #F880.  These very high-risk margin requirements require receipt and execution of a specific disclosure form, the "Futures Intraday Margin Disclosure", by the customer.  Ms. Patel was never provided the Futures Intraday Margin Disclosure.  Instead, that form was sent only to Mr. Patel who signed the form on his own behalf and on behalf of Ms. Patel.  The signature provided for Ms. Patel does not at all resemble her legal signature, which Schwab had access to by having a copy of Ms. Patel's driver's license and by virtue of its affiliation with TDA, which had possession of her legal signature on the account opening document for the TDA Brokerage Account #4195.  Schwab did not make any attempt to deliver the form to Ms. Patel or to verify her receipt or consent to the Futures Intraday Margin requirements.

136.    Defendant Schwab also did not make any attempt to provide Ms. Patel with trading statements for the Schwab Futures Account #F880, which statements would have shown the significant losses resulting from the high-risk margin trading.  Schwab emailed all statements and

other notices and disclosures only to Mr. Patel. Defendant Schwab allowed Mr. Patel to completely control the Schwab Futures Account #F880, delivering to him all statements and other notices without providing any notice by email, regular mail, or telephone to Ms. Patel. Despite the significant losses and constant margin calls and debits from the TDA Brokerage Account #4195, Defendant Schwab never notified Ms. Patel of the activity in the Schwab Futures Account #F880.

137. Due to being a joint account holder in the TDA Brokerage Account #4195 and Schwab Futures Account #F880, Ms. Patel was named a Relief Defendant in the CFTC Action, she has had to turn over her joint personal property to the Receiver, and she has had to face liability to and claims of the CFTC and of the Receiver, Receivership Estate, and Receiver Entity Bluprint, for which she has paid a significant Settlement totaling over $4.3 million.

138. On March 19, 2021, nearly two years after Mr. Patel started using the TDA Brokerage Account #4195 to receive, transfer, and trade Bluprint investor deposits, and after the TDA Brokerage Account #4195 and the Schwab Futures Account #F880 had been completely depleted, TDA sent the Patels and their children a letter terminating its relationships with them and closing all of their accounts, without further explanation. TDA and Schwab breached their fiduciary duties and duty of care to Ms. Patel, by not attempting to notify her of the misconduct in the TDA Brokerage Account #4195 and Schwab Futures Account #F880 prior to the complete depletion of those Accounts.

**TDA's and Schwab's Actual Knowledge of Mr. Patel and Bluprint's Fraudulent Scheme**

139. TDA and the Patels had a long relationship lasting nearly 20 years during which the Patels used their TDA Brokerage Account #4195 for personal investing until mid-2019.

140. During the last 2 years of that brokerage-client relationship, the TDA Brokerage Account #4195 received at least $6,335,000 in 23 separate wire transfers from third parties (22 of

which were specifically marked for investment in Bluprint in the memo line) plus a wire for $298,000 from a lender.

141.    TDA had actual knowledge of the receipt of these wire transfers from third parties into the TDA Brokerage Account #4195 as it processed, reviewed, and accepted each one of the transfers to allow them to clear in direct violation of TDA's policy prohibiting the acceptance of transfers from third parties into the TDA Brokerage Account #4195.

142.    TDA and Schwab both had actual knowledge that those transfers into the TDA Brokerage Account #4195 were swept into the brokerage and futures trading platforms for trading in short-term securities and futures positions at TDA and at Schwab.

143.    TDA had actual knowledge that those funds were also transferred to other trading institutions by wire transfer.

144.    TDA had actual knowledge that those funds were also used for personal expenses such as to place a deposit on a luxury automobile and to fund a brokerage account held by Mr. Patel and his son.

145.    TDA and Schwab had actual knowledge that the high-risk trading resulted in significant losses.

146.    TDA had actual knowledge that the TDA Brokerage Account #4195 received a constant influx of deposits from third parties (many of whom were repeat investors) to keep the margin trading debts paid and to allow for ongoing high-risk trading.

147.    TDA had actual knowledge that the account management style for the TDA Brokerage Account #4195 dramatically changed from a personal investment account to a high-volume, risky, futures trading account using funds received from third parties (but not until TDA and Schwab unjustly enriched themselves with two years of fees and commissions).

148.   Finally, recognizing the TDA Brokerage Account #4195 and Schwab Futures Account #F880 were running afoul of applicable law and/or TDA's and Schwab's own policies and procedures, TDA suddenly and without explanation closed all Patel family accounts including the Schwab Futures Account #F880.  TDA's and Schwab's actions were too little too late.

149.   During the Relevant Period, Defendants shared common ownership and were both part of the overall TD Ameritrade brand.  They also allowed customers like the Patels to instantaneously transfer funds as intrabank transfers between the two Defendants.  The TDA Brokerage Account #4195 served as the depository account for the trading scheme.  Then, the TDA Brokerage Account #4195 was automatically swept to cover the trading orders and margin calls in the Schwab Futures Account #F880.  As such, the two accounts functioned as one account. Therefore, as to the conduct subject of this Complaint, Defendants are functionally integrated, and any actual knowledge and information relevant to the legal proceeding could be imputed to both Defendants.

150.   TDA's and Schwab's actual knowledge is also imputed to the Charles Schwab Corporation as the subsequent purchaser of TDA and of TDA Futures & Forex LLC, the original holder of the Schwab Futures Account #F880, and as the parent company of Schwab Futures & Forex LLC, the subsequent holder of the Schwab Futures Account #F880.

151.   All conditions precedent to filing this Complaint have been met.

152.   This action is brought within the pertinent statutory limitations period.

153.   Because Mr. Patel operated Bluprint from its headquarters in Wellington, Florida, the transactions involving Mr. Patel, TDA, and Schwab were carried out in Florida, the Transfers originated from the TDA Brokerage Account #4195 and Schwab Futures Account #F880 located in

Florida, and the misconduct described herein took place in Florida, Florida law applies to the fraudulent transfer claims brought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Aiding and Abetting Breach of Fiduciary Duty**
**(By Receiver as Assignee of Ms. Patel's Claims Against TDA and Schwab)**

154.    Plaintiff, as assignee of Ms. Patel's claims, re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 153.

155.    During the Relevant Period, Mr. Patel was Ms. Patel's husband and joint accountholder of their TDA Brokerage Account #4195 and Schwab Futures Account #F880, and, as such, Mr. Patel owed Ms. Patel a fiduciary duty.  Ms. Patel reposed trust in Mr. Patel who assumed control and responsibility for their joint accounts.

156.    During the Relevant Period, Mr. Patel had sole or nearly sole control over the Patels' TDA Brokerage Account #4195 and Schwab Futures Account #F880 which are the subject of this lawsuit.

157.    During the Relevant Period, Mr. Patel knowingly and intentionally engaged in an investment scheme using the TDA Brokerage Account #4195 and Schwab Futures Account #F880 against Ms. Patel's own interests thereby breaching his fiduciary duties to Ms. Patel.

158.    During the Relevant Period, Mr. Patel misappropriated investor funds held in the TDA Brokerage Account #4195 and Schwab Futures Account #F880 for personal use and for improper trading practices under applicable commodity futures trading laws.

159.    During the Relevant Period, Mr. Patel breached his fiduciary duty to Ms. Patel through the use of investors' funds for an unlawful purpose and by operating a commodity pool and

Ponzi scheme through the TDA Brokerage Account #4195 and Schwab Futures Account #F880, all of which was known to TDA and Schwab as alleged throughout this Amended Complaint.

160.    TDA and Schwab each aided and abetted Mr. Patel's breaches of fiduciary duty to Ms. Patel, by allowing Mr. Patel to run a commodity pool investment scheme using the TDA Brokerage Account #4195 and Schwab Futures Account #F880.

161.    Specifically, TDA knowingly processed and accepted wire transfers from third-party investors, earmarked for investment in Bluprint, into the TDA Brokerage Account #4195, in violation of its own banking policies, without providing notice to Ms. Patel.  TDA did so without questioning the sudden influx of capital beyond the Patels' reported net worth and the sudden change in trading volume, frequency, dollar amount, and risk level in the Patels' accounts.  Indeed, TDA permitted large investor deposits into the TDA Brokerage Account #4195 from third parties despite its policy that the only acceptable use of the Patels' TDA Accounts was to trade the Patels' proprietary funds.  TDA purposefully did not enforce its banking policies and accepted at least 23 wire transfers from 14 different third parties totaling over $6.3 million into the TDA Brokerage Account #4195 without even notifying Ms. Patel as a joint accountholder.

162.    TDA also aided and abetted Mr. Patel's breach of fiduciary duty to Ms. Patel when it swept Bluprint investor funds from the TDA Brokerage Account #4195 into the Schwab Futures Account #F880 for high-risk trading and to cover margin calls causing significant losses in the Patels' Brokerage Account.

163.    TDA also aided and abetted Mr. Patel's breach of fiduciary duty to Ms. Patel by facilitating the unauthorized opening of the Schwab Futures Account #F880 at Schwab in her name, without her knowledge or consent, and by transferring large sums of funds from the TDA Brokerage Account #4195 at TDA to the Schwab Futures Account #F880 at Schwab until all funds were lost.

164.     Schwab aided and abetted Mr. Patel's breach of fiduciary duty to Ms. Patel by allowing Mr. Patel to open and trade in the Schwab Futures Account #F880, accepting the new account application without any verification of identity, net worth, annual income, or trading experience for both account holders, including Ms. Patel.  Schwab failed to gather any background information or trading experience concerning Ms. Patel.  Schwab failed to verify her legal signature, knowledge, and consent to the opening of the Schwab Futures Account #F880, and consent to the high-risk trading carried out therein prior to opening the Schwab Futures Account #F880.  Schwab failed to provide any of the legally required disclosures to Ms. Patel.  Schwab also allowed Mr. Patel to trade on margin in the Schwab Futures Account #F880 without providing the legally required margin disclosures to Ms. Patel.

165.     Despite never obtaining consent or authorization from Ms. Patel, Schwab titled the Schwab Futures Account #F880 jointly in the names of both Mr. Patel and Ms. Patel.  Schwab opened the Schwab Futures Account #F880 as if it was intended for the Patels' personal investments and as if the Patels were qualified to trade their funds in the Schwab Futures Account #F880 despite having significant evidence to the contrary.

166.     Through this conduct, Schwab aided and abetted Mr. Patel to carry out a commodity pooling scheme using the Schwab Futures Account #F880 without Ms. Patel's knowledge or authorization.  Accordingly, Schwab aided and abetted the breach of Mr. Patel's fiduciary duties and duty of care to Ms. Patel by allowing the unauthorized, high-risk, and illegal trading in the Schwab Futures Account #F880 at Schwab in her name resulting in her liability to the Receivership Estate, Receivership Entity Bluprint, the CFTC, and the Bluprint investors and her payment of the $4.3 million pursuant to the Settlement approved by this Court.

167.    TDA and Schwab each had actual knowledge of Mr. Patel's ongoing misconduct in the TDA Brokerage Account #4195 and Schwab Futures Account #F880.  Therefore, Defendants had knowledge of the foreseeable and ongoing losses and damages suffered by Ms. Patel due to the misuse and misappropriation occurring in those accounts at Defendants of which Ms. Patel is a joint accountholder.

168.    TDA's and Schwab's actual knowledge came from: (i) TDA processing and accepting the third-party wire transfers of funds earmarked for Bluprint into the TDA Brokerage Account #4195 maintained at TDA; (ii) TDA processing Mr. Patel's immediate transfer of the third-party funds to the TDA trading platforms and to the high-risk Schwab Futures Account #F880 for margin trading; (iii) Schwab's sweeping of funds from the TDA Brokerage Account #4195 to cover the constant losses suffered in the Schwab Futures Account #F880; (iii) TDA and Schwab witnessing how Mr. Patel's account management and investing style, commencing in June 2019, greatly differed from the Patels' investment style for the previous 17 years; (iv) TDA and Schwab witnessing that Mr. Patel's account management and investment style commencing in June 2019 was not sustainable; (v) TDA processing and transferring at Mr. Patel's direction of funds to third parties using new third-party deposits and commingling third-party deposits with the Patels' personal funds and loan proceeds; (vi) TDA's and Schwab's preparation of account statements and demands for payment of margin debt evidencing that Mr. Patel's high-risk trading generated little or no revenue; (vii) TDA and Schwab discharging of AML-related duties pertaining to "know your customer" and customer due diligence, both at the onboarding stage and throughout the brokerage relationship with the Patels; (viii) TDA's and Schwab's access to personal and financial information for the Patels which would have revealed that Mr. Patel was misusing the Patels' TDA and Schwab accounts, without Ms. Patel's knowledge, consent, or participation; (ix) Schwab's opening the Schwab Futures

Account #F880 for Ms. Patel without her acknowledgement, consent, or authority; and (x) Schwab's opening the Schwab Futures Account #F880 and allowing trading on margin without providing Ms. Patel with the legally required disclosures.

169.    Despite such knowledge, TDA and Schwab knowingly participated in and provided substantial assistance to Mr. Patel's breaches of fiduciary duties by, among other things: (i) carrying out Mr. Patel's instructions to misappropriate Bluprint's funds, by allowing him to use Bluprint's funds to carry out a commodity pooling and Ponzi scheme through the Patels' joint accounts; (ii) providing critical access to brokerage and futures trading platforms to allow Mr. Patel to perpetuate the commodity pooling and Ponzi scheme through the Patels' joint accounts; (iii) allowing Mr. Patel to misappropriate Bluprint's funds by using them for payment of clearly personal expenses and transfers to the Patels' son; and (iv) failing to or refusing to fulfill "know your customer," due diligence, and other regulations and standard practices, including failing to implement and adhere to compliance and monitoring protocols concerning Mr. Patel's receipt and use of third-party funds in the **TDA Brokerage Account** #4195 and Mr. Patel's opening and use of the Schwab Futures Account #F880 without Ms. Patel's knowledge or authorization.

170.    As a direct and proximate result of TDA's and Schwab's aiding and abetting Mr. Patel's breach of fiduciary duty to Ms. Patel, Ms. Patel has been damaged at least in the amount of the $4.3 million Settlement payment to the Receiver.

WHEREFORE, Plaintiff, Melanie E. Damian, as the assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant TDA and Defendant Schwab, jointly and severally for compensatory damages and/or restitution, interest, and costs incurred by Ms. Patel due to both Defendants' aiding and abetting Mr. Patel's breach of his fiduciary duties to Ms. Patel.

## COUNT II

### (Negligence)
### (By Receiver as Assignee of Ms. Patel's Claims Against TDA and Schwab)

171.    Plaintiff, as assignee of Ms. Patel's claims, re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 153.

172.    This is a claim against Defendants TDA and Schwab stemming from their negligence in allowing Mr. Patel to collect, pool, and misappropriate Bluprint investor funds in the TDA Brokerage Account #4195 and Schwab Futures Account #F880 in breach of his fiduciary duties to innocent, unknowing, joint accountholder Ms. Patel.

173.    This is also a claim against Defendant Schwab stemming from its negligence in the unauthorized opening of the Schwab Futures Account #F880 without receiving consent from joint accountholder Ms. Patel, without providing the legally required disclosures to Ms. Patel, and without taking any measures to verify her knowledge of and/or authorization to be a named accountholder.

174.    TDA is a financial institution that had a duty to exercise reasonable care to Ms. Patel as an accountholder in the TDA Brokerage Account #4195 and, therefore, as its client.

175.    Schwab is a financial institution that had a duty to exercise reasonable care to Ms. Patel as an accountholder in the Schwab Futures Account #F880, and therefore, as its client.

176.    Financial institutions like TDA and Schwab have a duty to exercise reasonable care in knowing their clients and the sources and use of their funds.  Specifically, each Defendant had a duty of care to innocent, accountholder Ms. Patel requiring that each Defendant not facilitate the misuse of Ms. Patel's TDA Brokerage Account #4195 and of Ms. Patel's Schwab Futures Account #F880.

177.    Each Defendant also had a duty to take security measures that would detect and prevent fraudulent investment schemes, such as illegal pooling and trading of third-party funds.  It

was foreseeable that TDA's allowing receipt of 23 significant transfers, from 14 different third parties, over a two-year period, into the TDA Brokerage Account #4195 and sweeping those funds to the Schwab Futures Account #F880, purportedly opened only for personal trading by Schwab, would lead to fraudulent trading activity and violations of applicable securities and commodities laws.

178.    Among its duties and under applicable law, Defendants were each required to obtain sufficient identifying information to enable each Defendant to form a reasonable belief regarding the identity of its customers before opening accounts for them.[3]  Moreover, Defendant Schwab had a duty to obtain authorization from Ms. Patel before opening the Schwab Futures Account #F880 in her name.

179.    TDA and Schwab each breached their duties of care to Ms. Patel, by allowing Mr. Patel to run a commodity pool investment scheme using their TDA Brokerage Account #4195 and Schwab Futures Account #F880.

---

[3] Customer Identification Program ("CIP"): Under federal law in the United States, consumer trading institutions are required to have a CIP in place to verify the identity of their customers.  The CIP requires consumer trading institutions to obtain identifying information from each customer, such as name, date of birth, address, and identification number, and to verify that information through a reliable source such as a government-issued ID.

Know Your Customer ("KYC"): In addition to the CIP, consumer trading institutions have a KYC obligation, which requires them to have a thorough understanding of their customers' identities, business activities, and risk profiles.  This obligation includes ongoing monitoring of customer accounts and transactions to ensure that they are consistent with the customer's expected activities.

Enhanced Due Diligence ("EDD"): Consumer trading institutions are also required to conduct EDD on certain high-risk customers, such as foreign political figures, to ensure that they are not involved in money laundering or other illegal activities.

Anti-Money Laundering ("AML") Programs: Consumer trading institutions are required to have AML programs in place to detect and prevent money laundering and terrorist financing.  This includes monitoring transactions for suspicious activity, filing reports with regulatory authorities when necessary, and maintaining records of customer information.

180.     Specifically, TDA knowingly processed and accepted wire transfers from third-party investors, earmarked for investment in Bluprint, into the TDA Brokerage Account #4195, in violation of its own banking policies, without providing notice to Ms. Patel.  TDA did so without questioning the sudden influx of capital beyond the Patels' reported net worth and the sudden change in trading volume, frequency, dollar amount, and risk level in the Patels' accounts.  Indeed, TDA permitted large investor deposits into the TDA Brokerage Account #4195 from third parties despite its policy that the only acceptable use of the TDA Brokerage Account #4195 was to trade the Patels' proprietary funds.  TDA purposefully did not enforce its banking policies and accepted at least 22 wire transfers from third parties totaling over $6.3 million into the TDA Brokerage Account #4195 without even notifying Ms. Patel as a joint accountholder.

181.     TDA also breached its duty of care to Ms. Patel when it swept those investor funds from the TDA Brokerage Account #4195 into the Schwab Futures Account #F880s for high-risk trading and to cover margin calls causing significant losses in the TDA Brokerage Account #4195.

182.     TDA also breached its duty of care to Ms. Patel by facilitating the unauthorized opening of the Schwab Futures Account #F880 at Schwab in Ms. Patel's name, without her knowledge or consent, and by transferring large sums of funds from her TDA Brokerage Account #4195 to the Schwab Futures Account #F880 at Schwab until all funds were lost.

183.     Schwab breached its duty of care to Ms. Patel by allowing Mr. Patel to open and trade in the Schwab Futures Account #F880, accepting the new account application without any verification of identity, net worth, annual income, or trading experience for both accountholders. Schwab failed to gather any background information or trading experience concerning Ms. Patel. Schwab failed to verify her legal signature, knowledge, and consent to the opening of the Schwab Futures Account #F880, and consent to the high-risk trading carried out therein prior to opening the

Schwab Futures Account #F880.  Schwab failed to provide any of the legally required disclosures to Ms. Patel.  Schwab also allowed Mr. Patel to trade on margin in the Schwab Futures Account #F880 without providing the legally required margin disclosures to Ms. Patel.

184.  Despite never obtaining consent or authorization from Ms. Patel, Schwab titled the Schwab Futures Account #F880 jointly in the names of both Patel and Ms. Patel.  Schwab opened the joint Schwab Futures Account #F880 as if it was intended for the Patels' personal investments and as if the Patels were qualified to trade their funds in the Schwab Futures Account #F880 despite having significant evidence to the contrary.

185.  Through this conduct, Schwab assisted Mr. Patel to carry out a commodity pooling scheme using the Schwab Futures Account #F880 without Ms. Patel's knowledge or authorization. Accordingly, Schwab breached its duty of care to Ms. Patel by allowing the unauthorized, high-risk, and illegal trading in the Schwab Futures Account #F880 at Schwab in Ms. Patel's name resulting in her liability to the Receivership Estate, Receivership Entity Bluprint, and Bluprint investors.

186.  TDA and Schwab each had actual knowledge or reckless disregard of Mr. Patel's ongoing misconduct in the TDA Brokerage Account #4195 and Schwab Futures Account #F880. Therefore, Defendants had knowledge of the foreseeable and ongoing losses and damages suffered by Ms. Patel due to the misuse and misappropriation of Bluprint funds occurring in the accounts at TDA and Schwab of which she was a joint accountholder.

187.  TDA's and Schwab's actual knowledge came from: (i) TDA processing and accepting the third-party wire transfers of funds earmarked for Bluprint into the TDA Brokerage Account #4195 maintained at TDA; (ii) TDA processing and accepting Mr. Patel's immediate transfer of the third-party funds to the TDA trading platforms and to the high-risk Schwab Futures Account #F880 for margin trading; (iii) Schwab sweeping those third-party funds from the TDA

Brokerage Account #4195 to cover the constant losses suffered in the Schwab Futures Account #F880; (iii) TDA and Schwab witnessing how Mr. Patel's account management and investing style, commencing in June 2019, greatly differed from the Patels' investment style for the previous 17 years; (iv) TDA and Schwab witnessing that Mr. Patel's account management and investment style commencing in June 2019 was not sustainable; (v) TDA processing and transferring at Mr. Patel's direction funds to third parties using new third-party deposits and commingling third-party deposits with the Patels' personal funds and loan proceeds; (vi) TDA's and Schwab's preparation of account statements and demands for payment of margin debt evidencing that Mr. Patel's high-risk trading generated little or no revenue; (vii) TDA and Schwab discharging of AML-related duties pertaining to "know your customer" and customer due diligence, both at the onboarding stage and throughout the brokerage relationship with the Patels; (viii) TDA's and Schwab's access to personal and financial information for the Patels which would have revealed that Mr. Patel was misusing the Patels' TDA and Schwab accounts, without Ms. Patel's knowledge, consent, or participation; (ix) Schwab opening the Schwab Futures Account #F880 for Ms. Patel without her acknowledgement, consent, or authority; and (x) Schwab opening the Schwab Futures Account #F880 and allowing trading on margin without providing Ms. Patel with the legally required disclosures.

188.    TDA and Schwab also failed to follow federal regulations, including without limitation CIP, KYC, EDD, and AML.  *See* footnote 3, *supra*.

189.    Each Defendant failed to exercise reasonable care in establishing and maintaining programs to detect and prevent such fraudulent investment schemes.  Each Defendant knew that the Patels' Brokerage Account #4195 and Schwab Futures Account #F880s were engaged in very risky margin trading, losing large amounts of money, and that the account management for each account was not sustainable.

190.    Defendants TDA and Schwab each breached their duties of care toward Ms. Patel by not stopping the misuse of the Patels' joint accounts when it was clear that Mr. Patel was carrying out an illegal commodities pooling scheme through the Patels' joint accounts and thereby breaching his fiduciary duty to Ms. Patel and causing losses to Ms. Patel.  Yet, TDA and Schwab each deliberately refrained from rejecting the third-party wire transfers and from closing the Patels' joint accounts and/or refusing to carry out the transactions that obviously constituted illegal conduct and/or breaches of Mr. Patel's fiduciary duties.  In doing so, TDA and Schwab violated their own policies and acted in a commercially unjustifiable manner because, among other things, they either knew or recklessly disregarded and refused to learn facts readily available to them that indicated that Mr. Patel was misusing the joint accounts and causing damages to Ms. Patel.

191.    Defendant Schwab also breached its duty of care to Ms. Patel, specifically, by the opening of the Schwab Futures Account #F880 in Ms. Patel's name without her knowledge, consent, or authorization.  The failure to obtain sufficient identifying information and authority from Ms. Patel before opening the Schwab Futures Account #F880 caused the identity theft of Ms. Patel and allowed for reckless trading of investor funds in her name and exposed her to liability to the Receivership Estate, Receivership Entity Bluprint, and Bluprint investors, and the $4.3 million Settlement payment to the Receivership Estate.

192.    Instead of acting in a timely manner to enforce their own policies and comply with applicable regulations, Defendants waited two years, until the TDA Brokerage Account #4195 and Schwab Futures Account #F880 were nearly depleted, to shut them down and terminate the business relationship with the Patels.

193.    As the actual and foreseeable result of TDA's and Schwab's negligence, TDA and Schwab caused Ms. Patel to suffer damages, including without limitation her liability to the

Receivership Estate, Receivership Entity Bluprint, and Bluprint investors and her payment of $4.3 million to the Receivership Estate as part of her Settlement with the Receiver.

WHEREFORE, Plaintiff, Melanie E. Damian, as the assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant TDA and Defendant Schwab, jointly and severally for compensatory damages and/or restitution, interest, and costs incurred by Ms. Patel due to each Defendant's negligence in connection with the opening and misuse of the TDA Brokerage Account #4195 and the Schwab Futures Account #F880.

## COUNT III

### Fraudulent Transfer under § 726.105(1)(a), Fla. Stat., Florida Uniform Fraudulent Transfer Act (By Receiver on behalf of Receivership Entity Bluprint Against TDA and Schwab)

194.    Plaintiff, as Receiver, re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 153.

195.    This is a claim to avoid and recover fraudulent transfers pursuant to Florida Statutes Section 726.105(1)(a).

196.    The Receiver acting on behalf, and standing in the shoes, of Receivership Entity Bluprint has standing within the meaning of the Florida Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers of Bluprint funds that Mr. Patel made to Defendants TDA and Schwab pursuant to the actual fraudulent transfer provision of the Act.

197.    The Receiver, the Receivership Estate, and Receivership Entity Bluprint are each creditors of Mr. Patel and of Bluprint, as the term "creditor" is defined in the Florida Uniform Fraudulent Transfer Act.

198.    Because the Transfers were fraudulent under Florida Statutes Section 726.105(1)(a), the Receiver may avoid the Transfers, pursuant to Florida Statutes Section 726.109(2).

199. As detailed above, Mr. Patel made the Transfers of funds and/or assets totaling $414,086.96 to and for the benefit of Defendants TDA and Schwab.

200. The Bluprint funds transferred by Mr. Patel to TDA and Schwab were derived from Bluprint's investors. Those funds had been deposited into the Patels' TDA Brokerage Account #4195 at TDA and swept into the Patels' Schwab Futures Account #F880 at Schwab.

201. Defendants TDA and Schwab together received the Transfers totaling at least $414,086.96 from the Patels' TDA Brokerage Account #4195 and Schwab Futures Account #F880 without providing reasonably equivalent value to Bluprint, or to its creditors and investors, or to the Patels in exchange for the Transfers.

202. At the time that Mr. Patel made the Transfers of Bluprint funds to TDA and Schwab, Mr. Patel was operating Bluprint as a fraudulent scheme and Ponzi scheme to the detriment of Bluprint, its investors and creditors.

203. Mr. Patel made the Transfers to TDA and Schwab in furtherance of that fraudulent scheme and Ponzi scheme to pay commissions and fees for the illegal trading conducted in the TDA Brokerage Account #4195 and in the Schwab Schwab Futures Account #F880.

204. At the time that Mr. Patel directed the trading activity leading to the Transfers, Mr. Patel removed and/or concealed assets of Bluprint from the reach of its investors and creditors and from Ms. Patel. Mr. Patel was also operating a commodity pooling scheme and engaged in high-risk trading against the interests of Bluprint, its investors and creditors, and Ms. Patel as a joint accountholder of TDA Brokerage Account #4195 and Schwab Schwab Futures Account #F880.

205. Thus, Mr. Patel had the actual intent to delay, hinder, or defraud creditors of Bluprint, and made the Transfers to delay, hinder, or defraud those creditors. Consequently, the Transfers were inherently fraudulent pursuant to Florida Statutes Section 726.105(1)(a).

206.    As a direct and proximate result of Mr. Patel fraudulent Transfers of Bluprint funds to TDA and Schwab, the Receivership Estate and Receivership Entity Bluprint have been diminished in the amount of at least $414,086.96, and the remaining assets of the Receivership Estate and Receivership Entity Bluprint are insufficient to pay Receivership Entity Bluprint's Restitution Obligation and/or the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and creditors who were defrauded by Mr. Patel and Bluprint.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver and on behalf of Receivership Entity Blurpint, respectfully requests that the Court enter judgment against Defendant TDA and Defendant Schwab, jointly and severally: (1) determining that the Transfers of Bluprint funds to both Defendants were fraudulent and avoiding those Transfers for the benefit of the Receivership Estate and Receivership Entity Bluprint; (2) entering a money judgment against both Defendants in the full amount of the Transfers they received, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; and (3) awarding Plaintiff damages, costs, prejudgment interest, and post-judgment interest.

## COUNT IV

**Fraudulent Transfer under § 726.105(1)(b), Fla. Stat.,**
**Florida Uniform Fraudulent Transfer Act**
**(By Receiver on behalf of Receivership Entity Bluprint**
**Against TDA and Schwab)**

207.    Plaintiff, as Receiver, re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 153.

208.    This is a claim to avoid and recover fraudulent transfers pursuant to Florida Statutes Section 726.105(1)(b).

209.    The Receiver acting on behalf, and standing in the shoes, of Receivership Entity Bluprint has standing within the meaning of the Florida Uniform Fraudulent Transfer Act to seek

the return of fraudulent Transfers of Bluprint funds that Mr. Patel made to Defendants TDA and Schwab pursuant to the constructive fraudulent transfer provision of the Act.

210. The Receiver, the Receivership Estate, and Receivership Entity Bluprint are each creditors of Mr. Patel and Bluprint, as the term "creditor" is defined in the Florida Uniform Fraudulent Transfer Act.

211. The Transfers were made to Defendants without Bluprint, its investors and creditors, and/or the Patels receiving reasonably equivalent value in exchange for the Transfers or obligations incurred by Bluprint or the Patels. In fact, TDA did not provide *any* value to Bluprint, its investors and creditors, or the Patels in exchange for the Transfers or otherwise, and Bluprint and the Patels never earned actual profits for themselves or for Bluprint's investors despite payment of significant trading fees and commissions to Defendants.

212. Any services that Defendants may have provided to the Patels or to Bluprint only facilitated and perpetuated the fraud against then-current investors and the new investors being recruited and the breaches of fiduciary duty to Ms. Patel. Thus, Defendants did not provide any reasonably equivalent value or any other benefit to Bluprint, its investors and creditors, or to the Patels in exchange for the Transfers Defendants received from Mr. Patel and Bluprint; rather, the Transfers increased the damages suffered by Receivership Entity Bluprint by increasing the amounts it owes to its investors and creditors as reflected in the Restitution Obligation it has been ordered to pay in the CFTC Action.

213. Also, the Transfers occurred when the Patels' and Bluprint's remaining assets were unreasonably small in relation to Bluprint's business transactions and when Mr. Patel and Bluprint intended to incur or believed, or reasonably should have believed, that they would incur debts beyond their abilities to pay as they became due.

214.    As a direct and proximate result of the fraudulent Transfers of Bluprint funds to TDA and Schwab, Receivership Entity Bluprint has been damaged or otherwise diminished in the amount of at least $414,086.96, and the remaining assets of Receivership Entity Bluprint are insufficient to pay Receivership Entity Bluprint's Restitution Obligation and/or the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and creditors who were defrauded by Mr. Patel and Bluprint.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver and on behalf of Receivership Entity Bluprint, respectfully requests that the Court enter judgment against Defendant TDA and Defendant Schwab, jointly and severally: (1) determining that the Transfers of Bluprint funds to Defendants were fraudulent and avoiding those Transfers for the benefit of the Receivership Estate and Receivership Entity Bluprint; (2) entering a money judgment against Defendants in the full amount of the Transfers they received, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; and (3) awarding Plaintiff damages, costs, prejudgment interest, and post-judgment interest.

## COUNT V

**Unjust Enrichment as to the Transfers**
**(By Receiver on behalf of Receivership Entity Bluprint**
**Against Both Defendants)**

215.    Plaintiff, as Receiver, re-alleges and incorporate herein the allegations set forth in paragraphs 1 through 153.

216.    The Receiver, the Receivership Estate, and Receivership Entity Bluprint are each creditors of Mr. Patel and of Bluprint.

217.    Mr. Patel and Bluprint conferred a benefit on each of the Defendants when Mr. Patel and Bluprint made the Transfers of Bluprint funds to and/or for the benefit of Defendants in the amount of at least $414,086.96, all of which were derived from Bluprint's investors.

218.    TDA and Schwab each had knowledge of the benefit they received from Mr. Patel and Bluprint as a result of the Transfers of Bluprint funds and voluntarily accepted and retained the benefit conferred.

219.    It is inherently unfair and inequitable that the Bluprint funds transferred to TDA and Schwab, derived from investors defrauded in Mr. Patel and Bluprint's fraudulent scheme, are retained by and used to benefit TDA and Schwab, rather than being returned to the Receivership Estate for the benefit of Receivership Entity Bluprint and the defrauded investors and creditors.

220.    As a direct and proximate result of Defendants' retention of at least the $414,086.96 of Bluprint funds that Mr. Patel and Bluprint had fraudulently transferred to or for the benefit of TDA and Schwab, the Receivership Estate and Receivership Entity Bluprint has been diminished, and, under the circumstances, equity dictates that TDA and Schwab should return the funds they received from Mr. Patel and Bluprint to the Receivership Estate for the benefit of Receivership Entity Bluprint and the defrauded investors and creditors.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver and on behalf of Receivership Entity Bluprint, respectfully requests that the Court enter judgment against Defendant TDA and Defendant Schwab, jointly and severally: (1) determining that Defendants were unjustly enriched by the Transfers of Bluprint funds from Mr. Patel and Bluprint; (2) entering a money judgment against Defendants in the full amount of the Transfers they received, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; and (3) awarding Plaintiff damages, costs, prejudgment interest, and post-judgment interest.

## COUNT VI

**Aiding and Abetting Violation of Commodity Exchange Act**
**(by Receiver as Assignee of Ms. Patel's Claims Against TDA and Schwab)**

221.    Plaintiff, as assignee of Ms. Patel's claims, re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 153.

222.    TDA and Schwab each knowingly aided, abetted, counseled, induced, and/or procured the violations of the Commodity Exchange Act ("CEA") alleged herein.  TDA and Schwab did so knowing of Mr. Patel's violations of the law, and willfully intended to assist those violations in violation of 22(a)(1) of the CEA, 7 U.S.C § (a)(1).

223.    Section 22(a) of the CEA provides:

(1)      Any person. . .who willfully aids, abets. . .a violation of this Act [7 USCS §§ 1, *et seq.*] shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person –
*
*
 (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;
(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of
 (i) an option subject to section 4c of this Act. . .;
(ii) a contract subject to section 19 of this Act; or
(iii) an interest or participation in a commodity pool; or
(iv) a swap.

7 U.S.C. § 25(a)(1)(B)-(C).

224.    Mr. Patel, through TDA and Schwab, made multiple option contracts at issue here (the "Option Contracts") on behalf of investors, as provided in Section 25(a)(1)(B) of the CEA.  The Option Contracts are options on contracts for the future delivery of commodities, specifically, an index of securities, as described in the CEA, 7 U.S.C. §§ 25(a)(1)(B) and 6b(e)(3).

225.    As described *supra,* Mr. Patel was defrauding his investors in violation of 7 U.S.C §

60 (1), which states:

> (1) It shall be unlawful for a commodity trading advisor, associated person of a
> commodity trading advisor, **commodity pool operator**, or associated person of
> a commodity pool operator, by use of the mails or any means or instrumentality
> of interstate commerce, directly or indirectly—
>
> (A) to employ any device, scheme, or artifice to defraud any client or
> participant or prospective client or participant; or
>
> (B) to engage in any transaction, practice, or course of business which
> operates as a fraud or deceit upon any client or participant or prospective
> client or participant.

7 U.S.C § 60 (1) (emphasis added).

226.    TDA and Schwab each knew that Mr. Patel was engaged in very risky margin trading

and losing large amounts of money, and that the account management of the TDA Brokerage

Account #4195 and Schwab Futures Account #F880 was not sustainable.

227.    TDA and Schwab each knew that the TDA Brokerage Account #4195 received third-

party funds and as a result was in possession of non-proprietary funds that Mr. Patel was collecting

in the TDA Brokerage Account #4195 and trading through both the TDA Brokerage Account #4195

and Schwab Futures Account #F880 in a commodity pool in violation of the CEA sections requiring

registration.

228.    By virtue of the conduct alleged above, TDA and Schwab each willfully and

recklessly aided and abetted Patel's violations of the CEA, and thereby violated 7 U.S.C. §

25(a)(1)(A).

229.    As a direct and proximate result of TDA's and Schwab's violations of the CEA, Ms.

Patel has suffered actual damages from the transactions involving the purchase and sale of

commodity futures.

230.    TDA and Schwab willfully aided and abetted the fraud by not conducting background

investigations of the Patels as required by the CEA.

231.    The failure to investigate the high-volume third-party transfers into the TDA Brokerage Account #4195 and subsequently into the Schwab Futures Account #F880 demonstrated extreme recklessness that departed from the standard of care for TDA and Schwab, each a futures commission merchant.

232.    The volume of transfers from third parties and the high-volume trading with turn-around losses in both the TDA Brokerage Account #4195 and the Schwab Futures Account #F880 was unusual in character and degree for a personal trading account and in direct violation of TDA's and Schwab's policies.

233.    A cursory review of the flow of funds into the TDA Brokerage Account #4195 and out to the Schwab Futures Account #F880 would have revealed that Mr. Patel was improperly investing for a commodity pool and would have prompted a closing of all of the Patels' accounts including the TDA Brokerage Account #4195 and the Schwab Futures Account #F880.

234.    Defendants both knew that Mr. Patel was running an improper commodity pool or Ponzi scheme and was trading on behalf of other investors in the Patels' TDA Brokerage Account #4195 and Schwab Futures Account #F880, as evidenced by, among other things, Defendants' access to and knowledge of the account activity and account opening documents for those accounts and the abrupt closing of those and other Patel family accounts at TDA and Schwab.

235.    As a direct and proximate result of TDA's and Schwab's aiding and abetting Mr. Patel's violation of the CEA through the Patels' TDA Brokerage Account #4195 and Schwab Futures Account #F880, Ms. Patel has been damaged in the amount of at least the $4.3 million she paid to the Receivership Estate pursuant to the Settlement, and she is entitled to recover her actual damages.

WHEREFORE, Plaintiff, Melanie E. Damian, as the assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant TDA and Defendant Schwab,

ANCILLARY CASE NO. 9:23-cv-80503-WM

jointly and severally, for compensatory damages and/or restitution, interest, and costs incurred by Ms. Patel due to Defendants' aiding and abetting Mr. Patel's violations of the CEA.

Dated: September 11, 2023.

Respectfully submitted,

**DAMIAN | VALORI | CULMO**
*Counsel for Plaintiff Melanie E. Damian,*
*as Receiver of Receivership Entity Bluprint,*
*LLC and Melanie E. Damian, Receiver, as Assignee*
*of Claims of Kalpana Patel*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*/s/Kenneth Dante Murena*
Kenneth Dante Murena, P.A.
Florida Bar No. 147486
kmurena@dvllp.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY the foregoing document was electronically filed using the Court's CM/ECF system, which sent a Notice of Electronic Filing to all counsel of record, this 11th day of September, 2023.

*/s/ Kenneth Dante Murena*
Kenneth Dante Murena